IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| BETTY WILSON, et al., | ) |
| Plaintiffs, | ) ) ) |
| v. | ) No. 2:14-cv-04220-NKL ) |
| CITY OF COLUMBIA, et al., | ) ) ) |
| Defendants. | ) |

**ORDER**

Plaintiffs Betty Wilson and Michael MacMann participated in a referendum petition process to repeal ordinances passed by the Columbia City Council. The ordinances were eventually repealed by the Council. Nonetheless, the Plaintiffs claim that the Defendants, City of Columbia and City Manager Mike Matthes, interfered with the referendum process and thereby violated the Plaintiffs' rights under the City Charter, the Missouri Constitution, and the First and Fourteenth Amendments to the U.S. Constitution. The Defendants move for summary judgment. [Doc.42.] Summary judgement is granted in their favor.

**I.   Relevant Facts[1]**

On March 19, 2014, Ordinance 022010 (Ordinance A) was approved by the City Council. It authorized the City Manager to execute an agreement with Opus Development Company, LLC. The agreement stated that there were inadequate water, fire protection, electric, storm water, and sanitary sewer facilities to serve the student housing project that Opus wanted to build downtown. To ensure adequate infrastructure for the increased demand of the new project, Opus

---

[1] The relevant facts are viewed in the light most favorable to the Plaintiffs. Both parties have included many facts that are not relevant, such as what the Plaintiffs thought the ordinance covered, or actions taken by the Plaintiffs' attorney that relate to the second ordinance. These facts and other facts not relevant to the issues before the Court are not included.

agreed to contribute $450,000 for infrastructure improvements in the area. The City agreed to permit construction of the project pursuant to the terms of the agreement and applicable law, "provided all requisite permits have been issued by the City[.]" [Doc. 51-1, Exhibit E.]

A referendum petition for repeal of Ordinance A, began circulating within a week. On May 29, 2014, the proponents of this first referendum petition (Referendum A), received certification of the requisite number of signatures needed to submit the matter to a vote of the people.

Before that certification, Defendant Matthes signed the Opus Development Agreement authorized by Ordinance A, knowing that Referendum Petition A was circulating. Mayor McDavid also publicly criticized the repeal effort as "reckless and irresponsible." [Doc. 51-18, p. 46.] In addition, on May 19, 2014, Ordinance 022071 (Ordinance B) was approved by the City Council. Ordinance B was in all material ways the same as Ordinance A, the subject of the ongoing referendum process. Ordinance B also contained a contingency. It provided that if no referendum was filed to repeal Ordinance B, then Ordinance A was automatically repealed. [Doc. 51-2, p. 1.]

At the time Ordinance B passed, Ordinance A was still in effect. Plaintiffs began gathering signatures to repeal Ordinance B and this second referendum petition (Referendum B) was certified July 31, 2014.

Prior to Referendum B being certified, the City Council repealed Ordinance A pursuant to Section 133 of the City Charter. Thereafter, on July 7, 2014, the City Council adopted a resolution that authorized the temporary closure of certain sidewalks and parking lanes around the construction site. At some point, Opus also applied for and received necessary permits pursuant to administrative procedures. These permits included a land disturbance permit, demolition permit, footings and foundation permit, and building permit.

2

The City Council voted to repeal Ordinance B on August 18, 2014, pursuant to Section 133 of the City Charter. The development agreement authorized by Ordinance B was never executed by the City.

## II. Plaintiffs' claims

The Plaintiffs claim that the Defendants interfered with their rights to participate in the referendum process and thereby violated their First and Fourteenth Amendment rights, as well as rights under the Missouri Constitution and the City Charter. They contend that once citizens exercise their referendum rights, the City could not constitutionally interfere with the process by making comments about the referendum or by introducing a second ordinance that was materially the same as the ordinance the petitioners were seeking to repeal. They also contend that Ordinance B was an effort to coerce the Plaintiffs to give up their right to participate in the referendum process by conditioning repeal of Ordinance A on no referendum petitions being filed to repeal Ordinance B. Finally they claim that Mayor McDavid intentionally interfered with the referendum process when he criticized the petitioners as reckless and the Defendants did likewise when they authorized permits to Opus during the referendum process.

## III. Discussion

As a preliminary matter, it is necessary to identify what referendum rights the Plaintiffs have under the City Charter and state law.

The Missouri Constitution, Article VI, § 19, provides that a city with a charter form of government shall "have all powers which the general assembly of the state of Missouri has authority to confer…, provided such powers are consistent with the constitution of the state and are not limited or denied either by the charter … or by statute." *Id*. *See also, City of Springfield v. Goff,* 918 S.W.2d 786, 789 (Mo. 1996) (en banc). Neither the Missouri Constitution, nor any state statute, nor the Columbia City Charter gives the citizens of Columbia an unlimited right to

3

seek a vote of the people concerning actions by the City administration or the City Council. Opportunities for direct democracy only exist if granted by the City Charter in a manner consistent with state law. *State ex rel. Powers v. Donohue,* 368 S.W.2d 432, 434 (Mo. 1963) (en banc); *State ex rel. Chastain, v. City of Kansas City,* 289 S.W. 3d 759 (Mo. Ct. App. 2009); *State ex rel. Petti v. Goodwin-Rafferty*, 190 S.W.3d 501, 504-05 (Mo. Ct. App. 2006);

The Columbia City Charter authorizes the voters to approve or reject most ordinances by referendum according to the following relevant provisions:

> **Section 128. Referendum.**
>
> The voters shall have power to approve or reject at the polls any ordinance passed by the council, … such power being known as the referendum….
>
> **Section 130. Filing and Certification of Petitions.**
>
> Within thirty (30) days after a [referendum] petition is filed, the city clerk shall determine whether … the petition is signed by a sufficient number of registered voters. After completing examination of the petition, the city clerk shall certify the result thereof to the council at its next regular meeting.
>
> \*\*\*
>
> **Section 133. Effect of a Referendum Petition.**
>
> When a referendum petition has been certified as sufficient, the ordinance specified in the petition shall not become effective, or, if it shall have gone into effect, further action thereunder shall be suspended until the ordinance referred has been approved by the voters as hereinafter provided. The council shall proceed forthwith to reconsider the referred ordinance, and its final vote upon such reconsideration shall be taken within thirty (30) days after certification and shall be upon the question: "Shall the ordinance specified in the referendum petition be repealed?"
>
> If the council shall fail to repeal an ordinance specified in any referendum petition, such repeal ordinance shall be submitted without alteration to the voters of the city at the next election provided for by state law….

***

> **Section 135. Effect of Vote.**
>
> If a majority of the voters voting on a proposed initiative ordinance or referred ordinance shall vote in favor thereof, it shall thereupon be an ordinance of the city, and shall, unless otherwise specified, become effective as indicated in Section 15 of this charter. No such ordinance shall be amended or repealed for six (6) months, except by unanimous vote of the council.

[Doc. 45, pp. 1-3.] There is nothing in the City Charter that permits a referendum to repeal a building permit granted by the City.[2]

In *State ex rel. Petti v. Goodwin-Rafferty*, 190 S.W.3d 501, 504-05 (Mo. Ct. App. 2006), the Missouri Court of Appeals further amplified how a city charter defines the right of its citizens to engage in direct democracy. In that case, the Florissant city council approved an ordinance that changed the zoning of certain property from single family to commercial, to allow a shopping center development project. Objecting to the development project, Florissant residents gathered signatures for a referendum petition seeking to have the new zoning ordinance set aside. The city clerk rejected the petition on the basis that the city charter explicitly excluded zoning ordinance amendments from the referendum process. The Court of Appeals held that because Florissant's charter explicitly excluded zoning ordinances from the referendum process, and the exclusion was not unlawful, the city clerk could not be compelled to accept and process the plaintiffs' referendum petition.

Similarly, in *State ex el. Powers v. Donohue*, 368 S.W.2d 432, 434 (Mo. 1963) (en banc)*,* the Missouri Supreme Court held that St. Louis County citizens did not have a right to amend a county zoning ordinance by initiative petition to prevent rezoning a specific piece of property. The initiative proponents had argued that "[t]o deny of the citizens of this state the right to

---

[2] Initiative petitions to adopt an ordinance are not at issue here, and therefore are not discussed.
5

correct zoning injustices through the initiative procedure would be to deny to them any measure of control over this vital aspect of their lives and property and to deprive them of any political-action remedy against outright confiscation and the most grievous wrongs." *Id.* at 437. The Missouri Supreme Court held the charter contained a comprehensive procedure for county zoning, and the initiative process was not available as a method of amending the county zoning ordinance.

Thus, the Court confines its analysis to the rights actually granted by state law and the Columbia City Charter.

### A. Violations of the Columbia City Charter and Missouri Constitution.

The Plaintiffs claim the Defendants violated the Columbia City Charter and the Missouri Constitution by interfering with their referendum rights. Specifically, the Plaintiffs object to the City Council passing Ordinance B while Referendum Petition A was being circulated. They also object to the City issuing permits to Opus prior to the conclusion of the referendum process. The Court finds as a matter of law that the Defendants, by these acts, did not violate either the City Charter or the Missouri Constitution.

The City Charter, Section 133, says that once a referendum to repeal a City ordinance is certified, the ordinance that is the subject of the referendum "shall not become effective, or, if it shall have gone into effect, further action thereunder shall be suspended until the ordinance referred has been approved by the voters[.]"

As for Ordinance B, it was adopted on May 19, 2014, but certification of Referendum A did not occur until May 29, 2014. The City Charter did not require the City to suspend activity under Ordinance A until the Referendum A petition was certified. Therefore, the City Council did not violate the City Charter by adopting Ordinance B.

As for the issuance of permits during the referendum process, the Plaintiffs have not

6

identified the date on which each permit was issued. Therefore, they have failed to show that the permits were issued after certification of a referendum petition and before repeal of either Ordinance A or Ordinance B. However, even if permits were issued during a relevant time period, the Defendants did not violate Section 133 of the City Charter by issuing them. Section 133 only prevents the City from "taking further action under the ordinance" that the voters are seeking to repeal. It does not prohibit all activity related to the subject matter of the ordinance. As explained below, the permits were not issued "under" either Ordinance A or B.

Ordinance A authorized an agreement between Opus and the City. That agreement provides that Opus will contribute $450,000 for infrastructure improvements and the City "agrees to permit construction of the Project pursuant to … this Agreement and Applicable Law." [Doc. 51-1. Exhibit E.] An express condition precedent to the obligations of the parties under the agreement was that "all requisite permits have been issued by the City." [*Id.*] Applicable Law is defined as "those rules, regulations, official policies, standards and specifications ordinances and resolutions which are controlled by the City[.]" [*Id.*] The applicable law would include the permitting process. Thus the agreement between Opus and the City contemplated the permitting process as a separate and necessary step, but that process was not "further action under the ordinance." Prior to the ordinance, permits were required; while the ordinance was in effect, permits were required; and after the ordinance was repealed, permits were required. The purpose of the agreement was to get Opus to contribute to infrastructure improvements, not to give Opus the necessary permits simply by paying $450,000. When Ordinance A was adopted, inadequate infrastructure was an impediment to the Opus project moving forward, and the agreement between Opus and the City only addressed that impediment. Thus, when the City issued permits during the referendum process, it did not violate the City Charter.

7

Case 2:14-cv-04220-NKL   Document 107   Filed 09/21/15   Page 7 of 16

Ordinance B authorized an agreement that is in all material ways the same as the agreement authorized by Ordinance A. Therefore, the same analysis is applicable to permits issued after Ordinance B was certified and before it was repealed.

In their supplemental suggestions in opposition, the Plaintiffs point to *Earth Island Inst. v. Union Elec. Co.,* 456 S.W.3d 27 (Mo. 2015) (en banc), to argue that the Missouri Constitution was violated by the enactment of Ordinance B. [Doc. 99, pp. 21-22.] *Earth Island* involved a ballot initiative to enact a statute requiring electric utilities to generate more electricity with renewable energy. The ballot initiative was subsequently certified for placement on the 2008 election ballot. Before it could be voted on by the general public, the General Assembly passed Senate Bill 1181 to exempt electric utilities that met a certain renewable energy target. That target was lower than the threshold set by the initiative petition. Subsequently, the initiative petition statute was approved by the Missouri voters. When an electric utility sought exemption from the Public Service Commission pursuant to SB 1181, the proponents of the initiative petition claimed that SB 1181 was invalid. They argued that the legislature lacked authority to enact legislation amending the ballot initiative after it had been circulated and certified for placement on the ballot, but before it had been voted on by the general public.

The Missouri Supreme Court found that if SB 1181 was permitted to modify the initiative, "it would mean that, even though the initiative process had been properly followed, by the time that the voters enacted Proposition C, some of its provisions would never become law due to a statute passed by the legislature months earlier." *Id*. at 34. The Missouri Supreme Court held that "while the legislature may amend or repeal a statute adopted by initiative or referendum after it has been adopted, it may not validly do so once the measure is approved for circulation and prior to its passage." *Id*. at 35. But it also said "that these principles do not preclude the legislature from enacting a law in an area that already is the subject of an initiative

8

or referendum. To hold otherwise would allow the mere repetitive filing of an initiative petition to forestall legislation in that subject area from ever becoming law, even if the people repeatedly rejected the initiative. This would unduly and unnecessarily interfere with the ability of the legislature to carry out its intended duties." *Id.* at 30.

The Missouri Supreme Court also discussed with approval a case it had decided several decades earlier, *State ex rel. Drain v. Becker, Sec. of State,* 240 S.W. 229 (Mo. 1922) (en banc), in which it had "rejected a similar attempt to negate in advance the effect of a *referendum* ordered by the people." 456 S.W.3d at 35 (emphasis in original). *Drain* involved an act passed by the legislature to reorganize certain judicial circuits. The act was suspended by the filing of referendum petitions with the Secretary of State. But before petitions were voted upon, the legislature passed a new act during an extra session, the effect of which was to repeal a portion of the referred act. The Missouri Supreme Court concluded the new act, passed during the extra session, was void and of no effect. With respect to breadth of application of the referendum, the court held "[i]t is not reasonable to conclude, in the absence of words of limitation, that the power … reserved was intended to be other than complete." *Id.* at 231.

In contrast, the referendum provisions contained in the Columbia City Charter are expressly limited. The City Council, prior to certification, is not prohibited from taking "further action under the ordinance," and the City Council is authorized to repeal the referred ordinance after the certification but before a vote of the people. Perhaps if Ordinance B had been passed after certification and the City Council had not repealed it, *Drain* and *Earth Island* would make Ordinance B void even without a referendum to repeal it. Under those circumstances, a repeal vote on Ordinance A could have no practical effect because Ordinance B, which was materially the same, would still be in effect and the citizens would have to keep filing repeal referendums to stop the enforcement of an ordinance that the citizens had a right to repeal. It would be the

9

mirror image of *Earth Island*. But those are not the facts before the Court. Ordinance B was adopted before Referendum A was certified.

The Defendants are entitled to summary judgment on Plaintiffs' claims under the Missouri Constitution and Columbia City Charter.[3]

## B. First Amendment and Due Process

The Plaintiffs' claims under the First and Fourteenth Amendments also fail. There can be no Due Process violation if the Plaintiffs received the process they were due under Missouri law and the City Charter. And the Plaintiffs have not identified a First Amendment violation.

In *Dobrovolny v. Moore*, 126 F.3d 1111, 1113 (8th Cir. 1997), the Eighth Circuit affirmed the district court's rejection of freedom of speech and procedural due process challenges to Nebraska's initiative petition procedures. Nebraska's constitution provided that the number of petition signatures needed to place an initiative petition on the ballot is ten percent of the number of the state's registered voters on the day the initiative petition is submitted to the secretary of state. As a result, initiative petition proponents could not know the exact number of signatures needed to place their petition on the ballot until they submitted the petition for review.

The *Dobrovolny* plaintiffs relied primarily on *Meyer v. Grant,* 486 U.S. 414 (1988), in support of their argument that the Nebraska procedure violated their right of free speech. In *Meyer*, the Supreme Court had held that a Colorado statute criminalizing payment of initiative petition circulators violated the First Amendment. The law restricted political speech by limiting "the number of voices" that could spread the proponents' message, making less likely the chances that proponents could "garner the number of signatures necessary to place the matter on the ballot." 486 U.S. at 420-23. The Supreme Court applied "exacting scrutiny" because the

---

[3] The Plaintiffs have always contended that there was not adequate infrastructure to support the Opus project, both at the time Ordinances A and B were passed and when the permits were issued. However, because Columbia residents cannot by referendum address administrative actions, the sufficiency of downtown infrastructure is not relevant to Plaintiffs' claims here.

statute restricted "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Id*. at 420-22.

The Eighth Circuit concluded *Meyer* did not apply to the First Amendment claim before it in *Dobrovolny*. In contrast to the Colorado statute, the Nebraska procedure did not impact the communication of the plaintiffs' message, restrict circulation of the initiative petition, restrict the plaintiffs' ability to communicate with voters, nor regulate the content of the plaintiffs' speech. 126 F.3d at 1112-13. Any difficulty of the process alone was "insufficient to implicate the First Amendment, as long as the communication of ideas associated with the circulation of petitions is not affected." *Id*. "*Meyer* does not require us to subject a state's initiative process to strict scrutiny in order to ensure that the process be the most efficient or affordable. Absent some showing that the initiative process substantially restricts political discussion[,]... *Meyer* is inapplicable." *Id.* (*citing Biddulph v. Mortham*, 89 F.3d 1491, 1498 (11th Cir. 1996), *cert. denied*, 519 U.S. 1151 (1997)). The Eighth Circuit concluded that the Nebraska procedure did not restrict circulation of initiative petitions or communication of speech, "political or otherwise," and therefore did not violate the First Amendment. *Id.* at 1113.

As for their due process claim, the *Dobrovolny* plaintiffs argued they had a property interest at stake in their initiative campaign because they had invested time, money, and effort in the process, as well as a liberty interest affected by their inability to know the exact number of signatures needed in advance. *Id.* The Eighth Circuit disagreed:

> Clearly, the right to a state initiative process is not a right guaranteed by the United States Constitution, but is a right created by state law. *See Taxpayers United for Assessment Cuts v. Austin*, 994 F.2d 291, 295 (6th Cir.1993). Moreover, the procedures involved in the initiative process, including the calculation of the number of signatures required to place an initiative measure on the ballot, are state created and defined. Therefore, if any right to the initiative process or specifically to prior notice exists, it is dependent upon a finding that state law has created in [the plaintiffs] an interest substantial enough to rise to the level of a

11

> "legitimate claim of entitlement" protected by the Due Process Clause. *Board of Regents v. Roth*, 408 U.S. 564 [ ] (1972); *Montero v. Meyer*, 13 F.3d 1444, 1447 (10th Cir.), *cert. denied*, 513 U.S. 888 [ ] (1994).

*Id.* It is always up to a state to "'to interpret [the] scope and availability'" of any state-conferred right or interest. *Id.* (*quoting Biddulph*, 89 F.3d at 1500 (*quoting Gibson v. Firestone*, 741 F.2d 1268, 1273 (11th Cir.1984)). "'[A] liberty interest created by state law is by definition circumscribed by the law creating it.'" *Id.* (*quoting Montero*, 13 F.3d at 1450). Thus, the *Dobrovolny* plaintiffs could "claim no constitutionally-protected right to place issues before the Nebraska electorate; any opportunity to do so must be subject to compliance with state constitutional requirements." *Id.* Furthermore, because the plaintiffs had no right under state law to prior notice of the exact number of signatures required to place an initiative measure on the ballot, they had "no right or interest which would entitle them to due process protection." *Id.*

In *Initiative and Referendum Institute v. Walker,* 450 F.3d 1082 (10th Cir. 2006), the Tenth Circuit rejected a First Amendment challenge similar to the one rejected by the Eighth Circuit in *Dobrovolny*. In *Walker,* wildlife and animal advocacy groups challenged a Utah constitutional provision requiring a supermajority for passing wildlife-related initiatives, but not other initiatives. The advocacy groups focused primarily on the argument that the supermajority requirement burdened core political speech by making passage of wildlife initiatives more difficult. Disagreeing, the Tenth Circuit explained that "[a]lthough the First Amendment protects political speech incident to an initiative campaign, it does not protect the right to make the law, by initiative or otherwise." *Id.* at 1099. Thus, that court had previously struck down laws "dictating *who* could speak (only volunteer circulators or registered voters) or *how* to go about speaking (with name badges and subsequent reports)." *Id.* (*citing Am. Const. Law Found., Inc. v. Meyer,* 120 F.3d 1092, *aff'd sub. nom., Buckley v. Am. Const. Law Found., Inc.,* 525 U.S. 182 (1999)). The court explained that the "distinction is between laws that regulate or restrict the

12

communicative conduct of persons advocating a position in a referendum, which warrant strict scrutiny, and laws that determine the process by which legislation is enacted, which do not." *Id.* at 1099-1100.

The Tenth Circuit did not doubt the advocacy groups' sworn statements that they "found the heightened threshold for wildlife initiatives dispiriting, and [felt] 'marginalized' or 'silenced'" by it. *Id.* at 1101. But not "every structural feature of government that makes some political outcomes less likely than others—and thereby discourages some speakers from engaging in protected speech—violates the First Amendment." *Id.* at 1100. In other words, "[t]he First Amendment ensures that all points of view may be heard; it does not ensure that all points of view are likely to prevail." *Id.* at 1101. *See also Biddulph v. Mortham,* 89 F.3d 1491, 1500 (11th Cir. 1996) ("Most restrictions a state might impose on its initiative process would not implicate First Amendment concerns.")

The Eighth Circuit cited *Dobrovolny* as controlling, and discussed *Walker* and *Biddulph* with approval, in *Missouri Roundtable for Life v. Carnahan,* 676 F.3d 665, 676-77 (8th Cir. 2012). In *Missouri Roundtable*, the district court dismissed a political organization's claim that its First Amendment Rights were violated when Missouri officials prepared summaries for its proposed ballot initiatives. The political organization claimed the summaries "stymied and frustrated" its efforts to communicate its messages. *Id.* at 668. The Eighth Circuit affirmed. The Missouri law that required the state officials to prepare the summaries did not limit the number of petition circulators or regulate how many persons they could approach in attempting to gather signatures, nor did it restrict the speech of petition circulators. *Id.* at 676. Circulators were free to express disagreement with the officials' summaries, affix their own summaries, and prepare a written message explaining in what way they believed the state officials' summaries are misleading or deficient. *Id.* The state officials' summaries did not purport to be the petition

13

circulators' speech. *Id.*

Here, the Plaintiffs' First Amendment and Due Process claims are similar to the ones rejected in *Dobrovolny*, *Walker*, *Biddulph*, and *Missouri Roundtable*. The referendum process under the City Charter does not dictate who may speak, nor regulate the content of the speech. As previously discussed, the City did not violate the City Charter during the referendum process.

The Plaintiffs also complain about the Mayor's criticism of Referendum Petition A. While the Free Speech Clause restricts government regulation of private speech, it does not regulate government speech. *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009) (*citing Johanns v. Livestock Marketing Assn*, 544 U.S. 550, 553 (2005)). "A government entity is entitled to say what it wishes and to select the views that it wants to express." *Id*. (*citing Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995); *Rust v. Sullivan*, 500 U.S. 173, 194 (1991)). "It is the very business of government to favor and disfavor points of view." *National Endowment for Arts v. Finley*, 524 U.S. 569, 598 (1998) (Scalia, J.). Further, elected officials are to be given the widest latitude to express their views on issues of policy. *See Bond v. Floyd*, 385 U.S. 116, 135-136 (1966). City Council members had a First Amendment right to express their opinions on the referendum petitions, and were not required to publicly support them.

Finally, in their supplemental suggestions, the Plaintiffs rely on *Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*, 135 S.Ct. 2652 (2015), arguing the Supreme Court has recognized that in disputes "between citizens and their elected government, the citizens must prevail." [Doc. 99, p. 17.] That case involved Arizona citizens' attempt to exercise their right to initiative, as expressly provided in the Arizona Constitution, to seek to establish congressional districts by independent commission. The Supreme Court held that the people's use of the initiative did not run afoul of the Elections Clause of the United States Constitution, or 2 U.S.C. § 2a(c), which

14

regulates federal redistricting. The Supreme Court did not hold that the people's initiative powers were unlimited, or that such powers arose independently of the Arizona Constitution.

The Defendants are entitled to summary judgment on Plaintiffs' First and Fourteenth Amendment claims.

### C. The Plaintiffs' remaining arguments

Plaintiffs argue that Section 3 of Ordinance B creates an unconstitutional condition. Section 3 states:

> In the event a referendum petition is not filed by the voters with the City Clerk pursuant to City Charter Article XVII requesting a repeal of this ordinance within the timeframe allowed for filing a referendum petition under City Charter, [Ordinance A] shall hereby be repealed in its entirety.

[Doc. 51-2, p. 1.]

Generally, the unconstitutional conditions doctrine "is implicated when the government seeks a quid pro quo that limits the exercise of a person's constitutional rights in exchange for a government benefit." Vickie J. Williams, *Life Sciences Dual Use Research of Concern, Public Health and Safety, and the Doctrine of Unconstitutional Conditions*, 7 ST. LOUIS U. J. HEALTH L. & POL'Y 81, 83-84 (2013) (summarizing cases). *See also Rust v. Sullivan*, 500 U.S. 173, 197 (1991) ("[O]ur 'unconstitutional conditions' cases involve situations in which the Government has placed a condition on the recipient of [a] subsidy rather than on a particular program or service, thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally funded program.").

Assuming for the sake of argument that participation in a local referendum process is a "benefit" to which the doctrine could apply, which is far from clear, Section 3 of Ordinance B extracted no quid pro quo for citizen participation in the referendum process. Section 3 does not say that citizens cannot seek to repeal Ordinance B. It merely says that if there is no petition to

15

repeal Ordinance B then Ordinance A is repealed, thereby preventing two ordinances that are materially the same from being in effect at the same time.

The Plaintiffs' requests for declaratory and injunctive relief are also denied because all of their claims have failed on the merits.

## IV.     Conclusion

Defendants City of Columbia and Matthes' motion for summary judgment [Doc. 42] is granted.

s/ Nanette K. Laughrey  
NANETTE K. LAUGHREY  
United States District Judge

Dated:   September 21, 2015  
Jefferson City, Missouri